E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ROGER A. HSIEH (Cal. Bar No. 294195)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0600
    Facsimile: (213) 894-6265
    E-mail: Roger.Hsieh@usdoj.gov

JUSTIN M. WOODARD
HELEN H. LEE (Cal. Bar No. 283675)
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
    300 N. Los Angeles Street, Suite 2001
    Los Angeles, California 90012
    Telephone: (202) 262-7868
            (202)941-4529
    Facsimile: (202) 428-6950
    E-mail: Justin.Woodard@usdoj.gov
        Helen.Lee@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>HANNA TRINH DINH,<br>   aka "Hang Trinh Dinh",<br><br>       Defendant. | No. 2:23-MJ-1699-2<br><br>GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF BAIL REVIEW AND DETENTION FOR DEFENDANT HANNA TRINH DINH; EXHIBITS<br><br>Hearing Date: June 2, 2023<br>Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the<br>              Hon. Fernando L.<br>              Aenlle-Rocha |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, Assistant United States Attorney Roger A. Hsieh, and Department of Justice Trial Attorneys Justin M. Woodard and Helen H. Lee, hereby submits its Memorandum of Points and Authorities in support of its application to: (1) review the Magistrate Judge's decision setting terms and conditions of bail; and (2) request detention for defendant HANNA TRINH DINH, also known as "Hang Trinh Dinh" in the above-entitled matter based on flight risk and danger.

The government's application is based on the Memorandum of Points and Authorities and Exhibits contained herein, the files and records of this case, as well as any other evidence or argument that the Court may wish to consider at the hearing on this request.

Dated: May 19, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
ROGER A. HSIEH
Assistant United States Attorney

JUSTIN M. WOODARD
HELEN H. LEE
Department of Justice Trial
Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **Table of Contents**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................2

      A.   Defendant is Charged By Complaint for Her Fraud Scheme....2

      B.   Law Enforcement Attempts to Arrest Defendant, and
           Defendant Fails to Self-Surrender as Proposed.............2

      C.   Defendant Was Aware of the Arrest Warrant Through the
           FBI and Multiple Calls with Attorneys and Her Daughter....4

      D.   Instead of Returning to Los Angeles on a Previously
           Purchased Flight, Defendant Flees to Vietnam..............4

      E.   Despite Defendant Actually Fleeing to a Non-
           Extradition Country, the Magistrate Judge Orders Her
           Release...................................................6

III.  ARGUMENT....................................................7

      A.   Legal Standard...........................................7

      B.   The Section 3142(g) Factors Clearly Support Detention.....9

           1.   Defendant's Character and History: Fleeing and
                Falsely Representing that She Will Self-Surrender....9

           2.   Nature and Seriousness of the Offense Charged and
                Weight of the Evidence Support Detention...........13

           3.   Defendant is a Danger to the Community if
                Released...........................................14

IV.   CONCLUSION.................................................14

# <u>Table of Authorities</u>

**CASES**

<u>United States v. Accetturo</u>, 783 F.2d 382 (3d Cir. 1986)..............8

<u>United States v. Al-Arian</u>, 280 F. Supp. 2d 1345 (M.D. Fla. 2003)...13

<u>United States v. Ayvazyan</u>, 20-CR-579-SVW (C.D. Cal.)................12

<u>United States v. Dupree</u>, 833 F. Supp. 2d 241 (E.D.N.Y. 2011).......14

<u>United States v. Koenig</u>, 912 F.2d 1190 (9th Cir. 1990)......8, 10, 11

<u>United States v. Kouyoumdjian</u>, 601 F. Supp. 1506 (C.D. Cal. 1985)...7

<u>United States v. Megahed</u>, 519 F. Supp. 2d. 1241 (M.D. Fla. 2007).....
..................................................................... 11

<u>United States v. Mercedes</u>, 254 F.3d 433 (2d Cir. 2001)........... 12

<u>United States v. Motamedi</u>, 767 F.2d 1403 (9th Cir. 1985)............7

<u>United States v. Nicherie</u>, 2004 WL 7331735 (C.D. Cal. Apr. 21, 2004).
...................................................................9

<u>United States v. Possino</u>, 2013 WL 1415108 (C.D. Cal. Apr. 8, 2013)...
..................................................................13

<u>United States v. Smith</u>, 79 F.3d 1208 (D.C. Cir. 1996).............8

<u>United States v. Townsend</u>, 897 F.2d 989 (9th Cir. 1990)...........13

**STATUTES**

18 U.S.C. § 1343...............................................13

18 U.S.C. § 3142..............................................7, 8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3      On April 12, 2023, defendant Hanna Trinh Dinh, also known as
4  "Hang Trinh Dinh," learned there was a warrant for her arrest through
5  the FBI, her daughter, and an attorney.  Through an attorney,
6  defendant stated she was willing to self-surrender on April 18, 2023.
7  She failed to do so.  Instead of boarding a pre-purchased return
8  flight to Los Angeles to surrender, defendant bought a ticket on
9  Japan Airlines to a non-extradition country and fled to Asia with her
10  husband.  Even after learning that her United States passport had
11  been revoked, defendant sought to travel to Thailand from Vietnam and
12  did not seek to self-surrender.

13      After evading law enforcement and being the subject of intensive
14  international efforts to apprehend her, defendant was finally caught
15  and returned to the United States more than three weeks after she
16  learned about her arrest warrant.  At a detention hearing on May 9,
17  2023, Magistrate Judge Laurel Beeler of the Northern District of
18  California ordered defendant released on a $500,000 secured bond,
19  without location monitoring, and with her husband -- who accompanied
20  defendant during her flight from justice -- to serve as a surety.

21      The Magistrate Judge's release conditions are woefully
22  insufficient to reasonably assure the appearance of defendant.
23  Defendant already fled to a non-extradition country after learning
24  about her arrest warrant from at least three different sources.
25  Defendant's argument that her flight from justice was a
26  "misunderstanding" is contradicted by the evidence.  Because
27  defendant is a demonstrated flight risk and poses a danger to the
28  community, the government requests that the Court order her detained.

## II.   FACTUAL BACKGROUND

### A.   Defendant is Charged By Complaint for Her Fraud Scheme

On April 10, 2023, the government charged defendant and two co-defendants with wire fraud by a complaint.  The complaint affidavit (Dkt. 1) detailed defendants' extensive scheme to submit approximately 70 fraudulent loan applications under the federal Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") Program, in which the defendants obtained over $3 million in loan funds.  In addition to the loan fraud scheme, defendant's brother, co-defendant Anthony Hao Dinh, engaged in a $230 million scheme to defraud the Health Resources and Services Administration ("HRSA") Uninsured Program, a program that covered only uninsured patients for certain COVID-19 testing and treatment. While defendant is not currently charged in this health care fraud scheme, she was identified as the biller of the fraudulent claims.

### B.   Law Enforcement Attempts to Arrest Defendant, and Defendant Fails to Self-Surrender as Proposed

On April 12, 2023, the FBI called defendant's phone at approximately 7:32 a.m. from outside her home to arrest her.  No one picked up the phone.  Defendant acknowledges seeing law enforcement outside her home from a Ring doorbell camera.  After receiving a missed call from defendant around 7:52 a.m., the FBI called defendant's phone again and someone picked up but did not say anything.  At approximately 8:00 a.m., the FBI called defendant's phone again and left a voicemail message that there was an arrest warrant for defendant.  At approximately 10:11 a.m., law enforcement contacted defendant's daughter and informed her of defendant's arrest warrant.  The daughter stated "ok" when law enforcement asked her to

1   notify defendant about the arrest warrant.

2       Later that day, Assistant United States Attorney Roger Hsieh

3   emailed Tom Brown, an attorney who previously stated he represented

4   defendant, regarding the arrest warrant for defendant.  (Exhibit 1.)

5   AUSA Hsieh requested that defendant surrender the next day (April 13,

6   2023), and if she did not, noted that law enforcement would continue

7   to try to effectuate the arrest warrant.  Mr. Brown responded that he

8   would not be representing defendant in the current criminal matter

9   but that defendant "has authorized me to discuss her self-surrender,

10  however."  Defendant did not agree to the surrender date.  Instead,

11  Mr. Brown stated that defendant had left the state before April 12,

12  2023, and Mr. Brown requested a self-surrender date six days later:

13  "I am authorized to work with you to arrange for her return and self-

14  surrender on Tuesday, April 18."  Mr. Brown represented in the email

15  that defendant "is neither a flight risk" nor a danger.

16      AUSA Hsieh responded to Mr. Brown the same day with modified

17  options for defendant to self-surrender, either: (1) on April 13, by

18  11:00 a.m. local time at the nearest U.S. Attorney's Office in the

19  district where defendant was currently located (Mr. Brown did not

20  provide defendant's specific location); or (2) on April 14, by 11:30

21  a.m. at the U.S. Attorney's Office in Santa Ana, California.  AUSA

22  Hsieh noted that law enforcement would look to execute the arrest

23  warrant if defendant did not self-surrender.  Mr. Brown never replied

24  to the follow-up email from the government.  As noted below, however,

25  Mr. Brown or his law firm had multiple contacts with defendant after

26  AUSA Hsieh sent the email with the modified options for self-

27  surrender.  Defendant did not self-surrender on either of those dates

28  or on April 18, 2023, as she had proposed through Mr. Brown.

**C.   Defendant Was Aware of the Arrest Warrant Through the FBI and Multiple Calls with Attorneys and Her Daughter**

Call records from defendant's phone show that from approximately 7:53 a.m.[1] on April 12 and 4:34 p.m. on April 13, 2023 (converted from UTC to Pacific Time), more than 12 calls and attempted calls were made to and from defendant's phone to phone numbers associated with Tom Brown, Brown White & Osborn (Mr. Brown's law firm), or Tyler Creekmore, an attorney who works with Mr. Brown.  Multiple calls occurred after the FBI left a voicemail message on defendant's phone regarding her arrest warrant, and there were calls after AUSA Hsieh responded to Mr. Brown at approximately 6:38 p.m. on April 12 with the modified options for defendant to self-surrender.

Call records also show that on April 12, 2023 -- just minutes after law enforcement informed defendant's daughter of the arrest warrant -- that defendant and her daughter had calls lasting approximately 1 minute 54 seconds and 1 minute 20 seconds.  Thus, defendant was aware of her arrest warrant through the FBI's voicemail, her daughter, and both Mr. Brown and Mr. Creekmore.

**D.   Instead of Returning to Los Angeles on a Previously Purchased Flight, Defendant Flees to Vietnam**

Databases showed that defendant was on a cruise ship that departed from a port around Los Angeles on April 9, 2023, and that the cruise ship was scheduled to stop in Vancouver, Canada around April 14, 2023.  Airline records show that on March 19, 2023, defendant purchased a return ticket departing from Vancouver, Canada to Los Angeles on April 14, 2023.  This April 14 return flight to Los

---

[1]     Co-defendant Anthony Hao Dinh was arrested around 7:32 a.m. on April 12, 2023.

4

Angeles was consistent with the representation that defendant would self-surrender on April 18.  Even though this return flight was available for defendant to take to return to Los Angeles to self-surrender, defendant did <u>not</u> board the April 14 return flight after learning about her arrest warrant through multiple sources.

Instead of returning to Los Angeles, defendant purchased a ticket on Japan Airlines on April 14 that departed Vancouver, Canada on April 16 to Vietnam through Japan.  Defendant purchased this ticket after she represented through Mr. Brown on April 12 that she was willing to self-surrender on the arrest warrant on April 18. Defendant stayed in Canada until April 16, 2023, and then departed Vancouver on the Japan Airlines flight to Vietnam through Tokyo with her husband.

Well aware of her arrest warrant and having had numerous contacts with attorneys Tom Brown and Tyler Creekmore, defendant remained in Vietnam for over two weeks.  Neither Mr. Brown nor Mr. Creekmore contacted the government despite knowing that defendant was in Vietnam and that the government had stated it would attempt to effectuate the arrest warrant if defendant failed to self-surrender. (<u>Exhibit 2</u>, ¶ 9.)  The morning of April 25, 2023, defendant contacted the U.S. Embassy.  In a message, defendant made no mention of wanting to turn herself in to law enforcement.[2]  Instead, defendant requested

_____

[2] In a declaration, defendant's husband translates a message defendant purportedly sent to the U.S. Embassy that claims to contain a statement that, "Because April 12, FBI came to my house to bring me to the Courthouse."  (Dkt. 46 at 4, 7.)  The government understands that while U.S. Embassy has located a message from defendant, the message did <u>not</u> include the statement just quoted.  Further, the purported message appears to be an unsubmitted draft.  (<u>See</u> Dkt. 41, Ex. 2 at 1 (noting that "[b]y hitting submit, you certify the above information is true").)  Regardless, that purported statement does
*(footnote cont'd on next page)*

1  a temporary permit to travel from Vietnam to Thailand through May

2  2023 and noted she could get back to the United States from Bangkok

3  without providing a specific date she would purportedly fly back to

4  the United States.  This message made no mention of self-surrendering

5  to authorities.

6      In Vietnam, defendant switched hotels with her husband even

7  though this required her to pay for nights at the first hotel she

8  would not use herself.  Switching hotels helped defendant evade

9  Vietnamese law enforcement who could not initially locate defendant.

10  Vietnamese authorities eventually found defendant later that day on

11  April 25 at her new hotel, and upon being approached, defendant did

12  not self-surrender.  Instead, she claimed that she was Vietnamese and

13  therefore could not be arrested.  Vietnamese officials detained

14  defendant, and defendant was placed on a flight from Ho Chi Minh City

15  to San Francisco accompanied by law enforcement.  When the flight

16  landed at the San Francisco International Airport on the evening of

17  May 4, 2023, defendant was taken into federal custody and made her

18  initial appearance on May 5, 2023.

19      **E.   Despite Defendant Actually Fleeing to a Non-Extradition**

20      **Country, the Magistrate Judge Orders Her Release**

21      Defendant's initial appearance hearing was continued to May 9,

22  2023.  The day of the hearing, a former attorney for defendant, Tyler

23  Creekmore submitted a declaration.  (Exhibit 2.)  The declaration

24  states that on April 12, 2023, defendant "discovered through her Ring

25  doorbell that FBI agents went to her home early that morning."  (Id.

26  at ¶ 3.)  The declaration further claims that defendant "traveled to

27

28  not demonstrate that defendant tried to self-surrender.  Instead, the
    entire message shows that defendant's priority was to travel to
    Thailand rather than self-surrender.

Vietnam and Thailand for business purposes" without specifying what business purposes or providing any evidence of such. (Id. at ¶ 8.) Instead, upon her entry to Vietnam, defendant told an immigration official that she was traveling for tourism, not business. Mr. Creekmore claims that on April 25, 2023, defendant was taken into custody in Vietnam "after contacting the local United States consulate to self-surrender." (Id. at ¶ 9.) Not so. As noted above, defendant contacted the U.S. Embassy to seek a temporary travel permit to travel to Thailand on specific dates. Defendant did not represent to the U.S. Embassy that she would surrender to law enforcement or provide a specific date on which she would purportedly fly back to the United States. Further, the declaration does not deny that the attorneys spoke with defendant about the need to self-surrender and that the government would attempt to effectuate the arrest warrant as the government made clear in its April 12 email.

At the conclusion of the hearing, Magistrate Judge Beeler denied the government's detention request and issued a release order that set a $500,000 secured bond, without location monitoring, and identified defendant's husband as a surety. (Exhibit 3.) This Court stayed the release order and scheduled a hearing for June 2, 2023.

**III. ARGUMENT**

    **A.   Legal Standard**

The Court must detain a defendant when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d

1  1403, 1406 (9th Cir. 1985); <u>United States v. Kouyoumdjian</u>, 601 F.

2  Supp. 1506, 1508-10 (C.D. Cal. 1985).  A finding that pretrial

3  release will not guarantee the appearance of the defendant need only

4  be supported by a preponderance of the evidence.  <u>Motamedi</u>, 767 F.2d

5  at 1406.  A finding that a defendant is a danger to the community

6  needs to be supported by clear and convincing evidence.  18 U.S.C.

7  § 3142(f).

8       This Court's review of the detention issue is de novo.  <u>United</u>

9  <u>States v. Koenig</u>, 912 F.2d 1190, 1192 (9th Cir. 1990).  While the

10  "district court is not required to start over . . . and proceed as if

11  the magistrate's decision and findings did not exist," the district

12  court "should review the evidence before the magistrate and make its

13  own independent determination whether the magistrate's findings are

14  correct, with no deference."  <u>Id.</u> at 1193.  In support of that task,

15  the district court may hold additional evidentiary hearings, if the

16  court concludes such hearings would be helpful.  <u>Id.</u>  Under Section

17  3142(g), the Court should consider factors including the history and

18  characteristics of the defendant, the weight of the evidence against

19  the defendant, and the danger to the community if defendant was

20  released.

21       The rules concerning admissibility of evidence in criminal

22  trials do not apply to a detention hearing. 18 U.S.C.

23  § 3142(f)(2)(B).  The government may proceed in a detention hearing

24  by way of proffer.  <u>United States v. Smith</u>, 79 F.3d 1208, 1209-10

25  (D.C. Cir. 1996) (citing cases).  The rationale for permitting

26  detention hearings to proceed by way of proffer is that such hearings

27  are "neither a discovery device for the defense nor a trial on the

28  merits."  <u>Id.</u> at 1210.  "The process that is due is only that which

1    is required by and proportionate to the purpose of the proceeding."

2    Id.  That purpose does not include the right to confront non-

3    testifying government witnesses.  See United States v. Accetturo, 783

4    F.2d 382, 388-89 (3d Cir. 1986).

5        **B.   The Section 3142(g) Factors Clearly Support Detention**

6         Here, the Section 3142(g) factors weigh heavily in favor of

7    detention.  Particularly, defendant is a demonstrated flight risk who

8    chose to flee to Vietnam even after learning about her arrest warrant

9    and representing through an attorney she would self-surrender.

10           1.   Defendant's Character and History: Fleeing and Falsely

11                Representing that She Will Self-Surrender

12        First, defendant's character and history weigh heavily in favor

13   of detention.  Defendant was born in Vietnam, which is exactly where

14   she fled to upon learning of her arrest warrant.  Any purported

15   excuse that defendant "did not grasp the serious nature of this case

16   until she reached Vietnam" is simply not true and refuted by the

17   evidence in this case.  (Exhibit 2, ¶ 10.)  Prior counsel attempts to

18   frame defendant as someone trying to evade service of a "subpoena to

19   appear before the grand jury[.]"  (Id., ¶ 3.)  In reality, defendant

20   knew about the arrest warrant through the voicemail from the FBI,

21   conversations with her daughter, and multiple conversations with

22   attorneys Tom Brown and Tyler Creekmore.  Further, through counsel,

23   defendant represented that she would self-surrender on April 18.  But

24   instead of getting on a pre-purchased return flight to Los Angeles to

25   self-surrender after learning of her arrest warrant, she purchased a

26   new ticket, fled to Vietnam, and returned to the United States only

27   after being apprehended by Vietnamese law enforcement.

28

Defendant's misrepresentation of her willingness to self-surrender through counsel, flight to Vietnam to avoid prosecution, and attempt to obtain a temporary travel permit to Thailand even after learning of her revoked passport, all strongly support detention. See United States v. Nicherie, 2004 WL 7331735, at *5 (C.D. Cal. Apr. 21, 2004) (finding that defendant posed a risk of flight where defendant had previously fled the United States when facing charges in another case, evaded FBI authorities, stated that he needed two weeks to surrender but failed to do so, and voluntarily returned to the United States later).  Any assurance from counsel at this point that defendant will purportedly not flee if released must be viewed against this backdrop, past performance being the best predictor of future behavior.  Just last month, Mr. Brown represented that defendant was not a flight risk and willing to self-surrender on April 18.

Defendant's husband submitted a declaration that claims defendant's trip to Thailand that was planned for more than a year, insinuating that her travel to Southeast Asia was not to evade law enforcement.  Defendant, however, never claims that she planned to travel to Southeast Asia directly from Vancouver, Canada.  After learning about her arrest warrant, defendant inexplicably "no showed" for her April 14 flight back to Los Angeles from Canada and instead purchased an international flight to a non-extradition country that departed two days later for a trip purportedly planned more than a year ago.

Further, defendant travels to Vietnam approximately once a year, as well as to Europe and other countries in Asia once a year.  See 23-MJ-70616 (N.D. Cal.), Dkt. No. 4 at 2.  Defendant's husband

reported that defendant has traveled outside of the United States "many times." Id. Defendant's substantial international contacts further support detention. See Koenig, 912 F.2d at 1193 (defendant detained as a flight risk because of, inter alia, foreign contacts). While in Vietnam, defendant was approached by Vietnamese authorities and claimed that she was a Vietnamese citizen in attempt to avoid arrest. This statement could be at odds with defendant's statement to her pretrial services officer that she is a naturalized U.S. citizen. 23-MJ-70616 (N.D. Cal.), Dkt. No. 4 at 2.

Defendant's reported employment history includes being the "owner" of HD Financial Firm. Id. at 3. This is the very same company through which defendant allegedly sought to obtain multiple fraudulent PPP and EIDL Program loans, and about which she made false statements and submitted fake tax and bank records. Defendant's reported employment history also includes working for approximately 11 years at "Elite," which is known to be the medical practice run by co-defendant Anthony Hao Dinh, who is alleged to have orchestrated an over $230 million fraud through Elite and other businesses. Defendant was the biller for those allegedly fraudulent businesses. Notably, the list of employment reported by defendant to her pretrial services officer do not appear to relate to international travel. And despite her former attorney's claim that defendant was on business travel, defendant told a Vietnamese immigration officer that she was in the country for tourism upon arrival.

A co-defendant -- who did not flee law enforcement -- was arrested without incident and released on $7 million bail secured by real property and confined to home detention with location monitoring. Restrictions such as these would be insufficient to

reasonably assure the appearance of this defendant.  Defendant
already chose to flee to a non-extradition country.  Electronic
monitoring would also be of little consequence when compared to the
significant incentive that defendant has to flee.  See United States
v. Megahed, 519 F. Supp. 2d. 1241, 1244 (M.D. Fla. 2007) ("Neither
electronic monitoring nor the GPS system of surveillance defeats the
resolute, resourceful, energetic, and non-compliant releasee.").
Defendant could remove her location monitoring, obtain a fake
passport, and flee to another country through Canada or Mexico.  See,
e.g., United States v. Ayvazyan, CR 20-579-SVW (C.D. Cal. Jan. 3,
2022), Dkt. 1230 at 3-4 (describing defendant on location monitoring,
who surrendered passport, and then removed his location monitoring
bracelet and absconded)[3]; see also United States v. Mercedes, 254
F.3d 433, 437 (2d Cir. 2001) (reversing grant of pre-trial release
noting that home detention, family assurances, and electronic
monitoring not sufficient in face of strong evidence that defendant
presented flight risk and danger to community).

Further, any arguments that defendant has strong ties to the
Central District of California or supportive family members does not
assure defendant's appearance at future hearings.  Despite having
children and a home in the Central District of California, defendant
chose to flee to Vietnam after learning of her arrest warrant.
Further, defendant was in contact with her daughter and fled to
Vietnam with her husband.  Thus, defendant's family members could

---

[3] Defendant Richard Ayvazyan and his co-defendant wife
successfully fled to Montenegro despite having surrendered their
passports and being on location monitoring.  See
https://www.justice.gov/usao-cdca/pr/former-san-fernando-valley-
couple-extradited-united-states-montenegro-begin-prison.

1   have assisted defendant in remaining a fugitive.

2        Defendant's actual flight to a non-extradition country shows

3   that the conditions of release imposed by the Magistrate Judge are

4   insufficient.  Defendant poses a serious, palpable risk of flight and

5   no bond can reasonably assure that she will comply with pretrial

6   release conditions.

7              2.   Nature and Seriousness of the Offense Charged and

8                   Weight of the Evidence Support Detention

9        Second, the crime of wire fraud charged against defendant is

10  serious, and the evidence of that fraud against defendant and her co-

11  defendants is very strong.  As detailed above, defendant engaged in a

12  substantial, sophisticated financial fraud scheme that sought to

13  steal millions in taxpayer dollars.  There is strong evidence against

14  defendant, including false loan applications, fake tax documents,

15  altered bank records, phone records, and IP address information.

16  Defendant's alleged crime is one of lies and deceit: the very type of

17  crime that shows a defendant has the ability and motive to deceive

18  authorities and flee.

19       Defendant faces significant prison time, including a 20-year

20  statutory maximum sentence on the charge of wire fraud.  See 18

21  U.S.C. § 1343.  Relevant conduct, the reasonably foreseeable acts of

22  co-conspirators, and other evidence could make defendant's guidelines

23  range much higher than those cited by the defense.  The likelihood of

24  a significant sentence provides defendant an incentive to flee.  See

25  United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990)

26  ("[c]onsideration of the nature of the offenses charged involves

27  consideration of the penalties"); United States v. Possino, 2013 WL

28  1415108, at *4 (C.D. Cal. Apr. 8, 2013) ("The weight of the evidence

                                    13

against [defendant] is strong. Defendant's awareness of a potentially lengthy prison sentence and the perception of a likely conviction constitute powerful motivations to flee.").

These factors weigh towards defendant's detention.  See United States v. Al-Arian, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003) ("the stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee").

3.   Defendant is a Danger to the Community if Released

Finally, defendant presents a danger to the community if released.  As noted above, defendant and her co-defendants submitted approximately 70 fraudulent loan applications and received more than $3 million in proceeds.  The affidavit in support of the complaint also details a $230 million fraud scheme against the HRSA Uninsured Program which concern the largest HRSA uninsured patient fraud in the country with over $150 million paid.  Although the defendant is not currently charged with health care fraud, she was identified as the biller who submitted the fraudulent claims.  Defendant's fraud scheme took advantage of programs designed to help those in need during the COVID-19 pandemic, and financial fraud is a recognized danger to the community.  See, e.g., United States v. Dupree, 833 F. Supp. 2d 241, 244-45 (E.D.N.Y. 2011).  Even if confined to her home, defendant could still perpetrate her fraud schemes against others.

IV.  **CONCLUSION**

Defendant fled from justice and continues to be a flight risk and remains a danger to the community.  Accordingly, the government respectfully requests that the Court order defendant detained.

14